## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MELISSA FINCH, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No.  SA-15-CV-521-XR |
| | § | |
| CITY OF SAN ANTONIO, | § | |
| | § | |
| *Defendant*, | § | |

## ORDER

On this date, the Court considered Defendant City of San Antonio's Motion to Dismiss or for Summary Judgment (Docket no. 39), and the corresponding responses and replies, including Plaintiff Melissa Finch's Motion to Strike Evidence in Support of Defendant's Motion (Docket no. 54) and Defendant's Motion to Strike Plaintiff's Summary Judgment Response Evidence (Docket no. 49). After careful consideration, the Court will DENY Plaintiff's Motion, GRANT Defendant's Motion for Summary Judgment, and DISMISS Defendant's Motion to Strike as moot.

## BACKGROUND

Plaintiff Melissa Finch began working for the City of San Antonio in November of 2006 as a 911 operator in the Communications Unit of the San Antonio Police Department. Docket no. 39-1 at 8. In February of 2008, she was hired on a permanent basis to the position of Terminal Agency Coordinator/Administrative Assistant I. *Id*. Finch's job description for the Terminal Agency Coordinator ("TAC") position lists 27 different responsibilities and tasks, most of which

1

relate to the keeping, management, and functioning of TCIC/NCIC records.[1] Docket no. 45-3 at 1–2. Finch claims her main responsibilities in this role included acting as a liaison between the SAPD and the Texas Department of Public Safety, performing work validations, teaching classes relating to TCIC/NCIC records, and recertifying officers and civilians on these records. Docket no. 39-1. at 11.

Finch was not the only TAC in the Communications Unit, nor the only person who performed the job duties of this position. Another employee named Starla Blake also held the same title and served in the same role. *Id*. at 57. In late 2013, Monica McKnight was transferred to the Communications Unit, the same division as Finch, to teach the same courses that Finch was teaching. *Id*. at 26. When Blake eventually stepped down, Communications Manager Robert Uribe took on the additional responsibilities of the TAC role.  Docket no. 39-2 at 2.

Robert Uribe was hired as the Communications Manager in January 2013. *Id*. He was responsible for all communication matters for the SAPD, including overseeing 911 calls and dispatchers, performing certifications for use of the TCIC/NCIC records, and managing training sessions for use of those records. *Id*. Finch reported directly to Uribe, who reported to Captain David Scepanski. *Id*.

Throughout 2013, Uribe sought to enhance the performance and efficiency of the Communications Unit. *Id*. at 3. He observed the Unit for several months before eventually concluding that the training department would have to be restructured. *Id*. To this end, he reassigned McKnight to the Unit to assist with training, but Finch still played a role in scheduling who was to teach training sessions, and in teaching those sessions. *Id*. For the training schedule that she created for the year of 2014, Finch assigned herself to teach three out of 24

---

[1] TCIC/NCIC stands for Texas Crime Information Computer/National Crime Information Computer.  Docket no. 45-5 at 35.  These databases include fingerprint data, gun validation data, and other crime information. *Id*. at 36.

possible classes, the first of which was not until August 2014. Docket no. 39-1 at 46–48. Throughout this restructuring period and through spring of 2014, Finch complained that she was kept out of the loop and excluded from issues and discussions relating to her job. *Id*. at 48.

In December 2013, Uribe and Finch were in a meeting when Finch alleges she noticed Uribe staring at her breasts. *Id*. at 78–79. At the same time, Uribe asked her "[i]s it hot in here?" *Id*. On a few occasions prior, Finch says she noticed Uribe staring at her breasts, but Finch did not mention how many times this occurred and did not point to any specific instances. *Id*.

As he was restructuring the Communications Unit and seeking to improve overall communication, Uribe noticed that Finch's performance was lacking in that she communicated poorly, did not create or manage the training schedule efficiently, and generally failed to perform her duties in the training process. Docket no. 39-2 at 3. In early 2014, Uribe met with Scepanski and human resources to create a Performance Improvement Plan ("PIP") on which Finch would be placed. *Id*.

On March 21, 2014, Finch requested a meeting with Scepanski about her job. Docket no. 39-1 at 61–63. Scepanski told her to meet with or get permission from her direct supervisor, Uribe, before coming up the chain of command to him. *Id*. After the weekend, Finch spoke with Uribe on March 24. *Id*. at 66. At this meeting, Uribe presented Finch with approximately 20 emails of performance-related issues and discussed them with her. *Id*. Up to this point, Finch claimed that Uribe's restructuring of the Communications Unit had diminished her job responsibilities—as of March 24, she felt as though her duties included teaching coworkers about the records, fielding questions from officers about the records over the phone, and other menial tasks. *Id*. at 67–69. Uribe gave his permission for Finch to meet with Scepanski. *Id*. at 70.

At Finch's meeting with Scepanski the next day, Finch alleges that she described her

beliefs that the Communications Unit was mismanaging the records, that Uribe had been slowly syphoning away her job duties, and that Uribe had sexually harassed her in the December 2013 meeting by staring at her breasts. *Id*. at 70–71. Scepanski met with Uribe the next day to discuss Finch's job-related complaints and did not mention the sexual harassment allegations, Docket no. 39-2 at 3, as Scepanski contends that Finch never made these allegations to him, Docket no. 39-4 at 4. On March 27, 2014, Uribe met with Finch to place her on the PIP he had been developing in conjunction with Scepanski and human resources. Docket no. 39-2 at 3; Docket no. 39-1 at 82.

On April 24, 2014, Finch met with human resources representative Cythnia Chestnutt. Docket no. 39-5 at 2; Docket no. 39-1 at 99. There, Finch described the sexual harassment she suffered from Uribe, the complaints she made to Scepanski, and the retaliation she suffered from both. *Id*. at 99–100. Chestnutt investigated Finch's claims and reported them to her supervisor, but could not substantiate them. Docket no. 39-5 at 2–4. When a city attorney passed Finch's allegations along to an EEO investigator, Finch refused to speak with the investigator. Docket no. 39-6 at 9–10.

In June 2014, the Communications Unit began taking applications for the newly-created Assistant Communications Manager position. Docket no. 39-2 at 4; Docket no. 39-1 at 84–85. A panel of at least six SAPD members, including Uribe, conducted the interviews. Docket no. 39-2 at 4. Finch applied and was granted an interview but did not make it past the first round, and the position eventually went to internal candidate Monica McKnight. *Id*.

On July 29, 2014, Finch filed a complaint with the EEOC, alleging sex discrimination and retaliation. Docket no. 39-1 (Ex. A-8) at 43–45. She alleged that Uribe sexually harassed her in 2013, without providing details of the December 2013 meeting or any other incident, and that Scepanski retaliated against her in March 2014 by placing her on the PIP, removing her job

4

responsibilities as a TAC, and hiring a less qualified candidate for the Assistant Communications Manager position. *Id*. The EEOC issued a right to sue letter for this complaint on March 25, 2015. Docket no. 39-1 (Ex. A-10) at 47.

In November 2014, Finch became pregnant. Docket no. 39-1 at 120–22. When she told her supervisors later that month, she was granted leave from mid-November through mid-December. *Id*. When she returned, she accepted a transfer to the Fusion Unit, where she has been employed since. *Id*. at 127.

On June 18, 2015, Finch filed a second EEOC complaint, alleging that she was retaliated against for making a witness statement in support of a coworker's sexual harassment claim. Docket no. 39-1 (Ex. A-10) at 47. The witness statement was allegedly given on August 21, 2014. *Id*. Finch has not received a right to sue letter on this claim. *Id*.

Finch filed this action in June 2015, seeking damages for lost wages, mental anguish, and loss of benefits, along with injunctive relief entitling her to a higher job position. Docket no. 1 at 7. She alleges causes of action for retaliation, sex discrimination, pregnancy discrimination, and hostile work environment under Title VII, and similar causes of action under Chapter 21 of the Texas Labor Code. She further alleges violations of the Family Medical Leave Act ("FMLA") relating to denial of pregnancy leave and retaliation for taking leave.

Defendant filed a Motion to Dismiss and/or for Summary Judgment. Docket no. 39. Finch responded, Docket no. 45, and Defendant filed a reply, Docket no. 51. In addition, Finch filed a Motion to Strike, Docket no. 54, arguing that certain evidence cited in Defendant's motion should not be considered.

## DISCUSSION

### I.      Plaintiff's Motion to Strike

Because Finch challenges certain evidence that Defendant has presented in support of its

Motion for Summary Judgment, the Court will first assess the competency of this evidence

before assessing Defendant's substantive claim for summary judgment. Notably, Finch objects to

a statement in Uribe's affidavit:

> [D]uring this time [of restructuring the department in 2013], I had issues with Ms.
> Finch's performance issues, to include but not limited to her failure to
> communicate effectively with other stakeholders (ITSD); not effectively working
> through scheduling of TCIC/NCIC training, creating haphazard class schedules,
> and failing to perform duties which led to delays within the cadet training process.
> I brought these issues to the attention of Capt. Scepanski and Human Resources
> and we began preparation of a Performance Improvement Plan for Ms. Finch in
> early 2014. At no time did I take away Ms. Finch's duties. In fact, I attempted to
> refocus her attention to perform her duties.

Docket no. 54; Docket no. 39-2 at 3. Finch asserts that this statement is not based on personal

knowledge, and is self-serving.  Docket no. 54 at 4. Neither of these objections justify exclusion

of Uribe's statement.

Uribe's statements were based on personal knowledge. "An affidavit or declaration used

to support or oppose a motion [for summary judgment] must be made on personal knowledge, set

out facts that would be admissible in evidence, and show that the affiant or declarant is

competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). Finch states no justification

for the argument that Uribe's statement is not based on personal knowledge, and his statement is

an express recounting of his personal knowledge from his job duties and personal impressions of

Finch's performance. Moreover, Uribe's affidavit sets out the basis for his personal knowledge

of Finch's job performance—"[W]hen I started [as the Communications Manager], Finch was a

direct report to me"—a fact that Finch admits. Docket no. 45-2 at 3 ("[M]y supervisor was

Robert Uribe.").

Nor is Uribe's statement inadmissible simply because it is self-serving. In the summary judgment context, "testimony is often 'self-serving,' but we do not exclude it as incompetent for that reason alone." *C.R. Pittman Const. Co. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011). Further, Uribe's statements, though perhaps self-serving, are supported by other evidence in the record. For example, Finch states that Uribe brought her approximately 20 emails describing her performance issues during their March 2014 meeting, supporting the inference that Uribe had issues with Finch's performance, Docket no. 39-1 at 66, and Monica McKnight's description of Finch's job duties, training responsibilities, and scheduling decisions is consistent with Uribe's statement that he did not change Finch's duties, Docket no. 39-3 at 2–3.

For these reasons, Finch's Motion to Strike is DENIED, and the Court will consider Uribe's statement as competent summary judgment evidence.

## II.     Defendant's Motion to Dismiss or for Summary Judgment

### a.  Standards of Review

If a complaint fails to state a claim upon which relief can be granted, a court is entitled to dismiss the complaint as a matter of law.  FED. R. CIV. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim for relief must contain (1) "a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain statement of the claim showing that the pleader is entitled to the relief"; and (3) "a demand for the relief sought."  FED. R. CIV. P. 8(a).

In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint should be taken as true, and the facts are to be construed favorably to the plaintiff. *Bosarge v. Mississippi Bureau of Narcotics*, 796 F.3d 435, 439 (5th Cir. 2015).  To survive a 12(b)(6) motion, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  "Factual allegations must be enough to raise a right to relief above the speculative level." *Id*.  A well-pleaded complaint can survive a motion to dismiss even if actual proof of the facts alleged is "improbable." *Id.* at 556.

Under Rule 12(d),

> If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

FED. R. CIV. P. 12(d). "Generally, in deciding a motion to dismiss for failure to state a claim, if matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted).

Here, Defendant included evidence outside the complaint in its motion to dismiss pursuant to Rule 12(b)(6), but also moved for summary judgment pursuant to Rule 56. As such, the motion will be assessed under the applicable summary judgment standards. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial,

merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Lavespere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990), *cert. denied*, 510 U.S. 859 (1993). Once the movant carries its initial burden, the burden shifts to the non-movant to show that summary judgment is inappropriate. *See Fields v. City of South Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).

In order for a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the non-movant, or, in other words, that the evidence favoring the non-movant is insufficient to enable a reasonable jury to return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n4 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the non-movant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

### b. Title VII Claims[2]

Under Title VII, it is an "'unlawful employment practice' for an employer 'to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin.'" *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2525 (quoting 42 U.S.C. § 2000e–2(a)). The term "because of . . . sex" includes discrimination on the basis of an individual's pregnancy, and pregnancy discrimination claims are governed by the same standards as Title VII discrimination claims in general. 42 U.S.C. § 2000e(k); *Garcia v. Woman's Hosp. of*

---

[2] This section of the Court's opinion explicitly discusses Finch's federal Title VII claims, but it also disposes of Finch's state law claims brought under the Texas Labor Code for the same reasons, as these state law claims are generally governed by the same standards as the federal ones. *Harrison v. Corr. Corp. of Am.*, 476 F. App'x 40, 42 (5th Cir. 2012); *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010).

*Tex.*, 97 F.3d 810, 812 (5th Cir. 1996). Moreover, Title VII prohibits employers from retaliating against employees for engaging in protected conduct, which includes the filing charges of harassment or discrimination. 42 U.S.C. § 2000e–3(a); *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 325 (5th Cir. 2002).

In her complaint, Finch alleges that she was retaliated against for making charges of discrimination and that she was discriminated against on the bases of her sex and pregnancy. In addition, she alleges that she was subjected to a hostile work environment because of her sex.

### i. Exhaustion

Before addressing the individual claims, the Court takes note of Defendant's arguments on exhaustion, which Finch does not address. Docket no. 39 at 9–11; *see generally* Docket no. 45. Before a plaintiff can bring an employment suit under Title VII, he or she must exhaust administrative remedies. *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002). Broadly, this consists of filing a complaint with the EEOC, receiving a right to sue letter, and filing suit within the required time period after receiving the right to sue letter. *Id.* Where these requirements are satisfied, the scope of the ensuing lawsuit is generally limited to the scope of the properly exhausted EEOC complaint, but "a Title VII lawsuit may include allegations like or related to allegations contained in the EEOC charge and growing out of such allegations during the pendency of the case before the Commission." *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008) (internal quotations and alterations omitted).

Defendant does not contest that Finch's first EEOC complaint was properly exhausted. The allegations of her second complaint, however, are not a proper basis for her Title VII claims. Finch admits that she does not have a right to sue letter from her second complaint. Docket no. 39-1 at 125. Moreover, the allegations of this complaint relate to events that occurred *after* she

filed her first EEOC complaint—Finch claims she was retaliated against in the weeks and months after August 21, 2014 for making a witness statement, but her first EEOC complaint was filed in July. Because her second EEOC complaint is based on an event—her witness statement—that had not occurred when she filed the first complaint, the second complaint's allegations are outside the scope of the properly-exhausted first complaint and are not properly exhausted. Accordingly, the only allegations upon which Finch can rely for her Title VII claims are those that were contained in her July 2014 EEOC complaint.

Having set the scope of properly exhausted EEOC complaints, the Court now turns to Finch's causes of action.

### ii. Retaliation Claims

Where, as here, there is no direct evidence of discrimination, courts apply the *McDonnell-Douglas* burden-shifting framework to Title VII retaliation claims. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Jenkins v. City of San Antonio Fire Dep't*, 784 F.3d 263, 267–68 (5th Cir. 2015). To make out the prima facie case, a plaintiff must prove that (1) she engaged in conduct protected by Title VII; (2) she suffered a materially adverse action; and (3) a causal connection exists between the protected activity and the adverse action. *Jenkins*, 784 F.3d at 269 (citing *Aryain v. Wal–Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir.2008)). If the plaintiff makes these showings, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action, and if the employer makes such a showing, the burden then shifts back to the plaintiff to show that the employer's proffered reasons for the action are a pretext for retaliation. *Harris v. Mississippi Transp. Comm'n*, 329 F. App'x 550, 556 (5th Cir. 2009).

For an employment action to be materially adverse, "a plaintiff must show that a

reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted). This standard "prohibit[s] employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers," while accounting for the fact that "petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id*. If a plaintiff proves that she suffered an adverse action, she must finally prove that a causal link existed between the protected activity and adverse action. *Davis v. Fort Bend Cty.*, 765 F.3d 480, 489 (5th Cir. 2014), *cert. denied sub nom. Fort Bend Cty., Tex. v. Davis*, 135 S. Ct. 2804 (2015).

Defendant does not contest that Finch engaged in protected conduct, and indeed, the type of conduct protected by Title VII is broadly defined as opposition to any practice made unlawful by Title VII. *See Crawford v. Metro Gov't of Nashville and Davidson County, Tenn.*, 555 U.S. 271, 277–78. Accordingly, the Court assumes that Finch engaged in protected activity by making allegations of discrimination and filing an EEOC complaint.

Finch argues that there were three actions taken against her, any of which would constitute a "materially adverse action" to which her protected conduct is causally linked—(1) removal of her job duties; (2) failure to hire her for the Assistant Communications Manager position; and (3) her placement on the PIP. The Court will address each of these actions in turn.

### 1. Removal of Job Duties

Finch claims that, in retaliation for making charges of sexual harassment and discrimination, her job duties were diminished. Defendant responds that Finch has failed to identify any essential job functions of which she was stripped, and that she was still expected to

perform a multitude of duties.

There is no genuine issue of material fact as to whether any restructuring of Finch's responsibilities constitutes a materially adverse employment action. Finch's entire argument on this point is that her job written description contains 26 items and that, after the spring of 2014, she performed only two tasks from this list. Docket no. 45 at 24. This argument is undercut by Finch's own account of her responsibilities prior to the spring of 2014, regardless of the laundry list of duties that are in her job description. Finch states that when she started in 2008, her duties were to act as a liaison between the DPS and the SAPD, perform work validations, teach courses on the department's records, and provide certifications on these records. Docket no. 39-1 at 11. By March 2014, Finch states that her job responsibilities included fielding calls from officers, teaching coworkers about how to manage the records, and other "menial work." Any differences between Finch's accounts of her duties in 2008 and in 2014 account are not materially adverse, in that they would not discourage a reasonable employee from engaging in protected conduct.

Finch takes particular issue with the removal of her training responsibilities, but it is undisputed that Finch continued to conduct training sessions, that she was responsible for scheduling who was to perform training sessions, and that she made a schedule in January 2014 that did not have her teaching any classes until August 2014; her allegation that her training responsibilities were taken from her by Uribe throughout the spring of 2014 is belied by her own admission that she did not schedule herself until August of that year. Though other employees began teaching classes during this time period, Finch admits that she was the one who scheduled them to conduct these training sessions. Further, there is no dispute that other employees held the same job and training responsibilities as Finch long before she claims her duties were given to other employees.

Even if the diminishment of Finch's job duties did meet threshold for a materially adverse action, there is no dispute concerning its causal connection to her protected activity. By her own account, her duties were steadily reduced over a period of time leading up to March 24, 2014. As of that date, she felt that her job duties had already been diminished. Docket no. 39-1 at 67–68. Yet Finch's timeline of the events is such that she never engaged in any protected activity by raising complaints about Uribe's sexual harassment until March 25. As such, there is no dispute over whether any allegedly adverse action taken against Finch in the form of removed job duties could have been causally connected to her protected activity; her protected activity had not yet occurred.

Because any removal of Finch's job duties does not constitute a materially adverse action that is causally linked to her protected conduct, summary judgment is appropriate here.

### 2.  Failure to Hire

Defendant admits that giving the Assistant Communications Manager position to another candidate could be a materially adverse employment action. Further, because it is already assumed that Finch engaged in a protected activity, the only element left in her prima facie case is whether the protected activity was causally linked to the adverse employment action.

Finch points out that temporal proximity of an adverse action to a protected activity alone may satisfy the causation prong. *See Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997). She cites numerous cases for the proposition that temporal proximity of a few months' time between the adverse action and the protected activity can suffice to establish this element. *See, e.g.*, *id*. (finding that a one-month gap between an employee's most recent EEOC complaint and reassignment was temporally close enough to satisfy the causation element); *Richard v. Cingular Wireless LLC*, 233 F. App'x 334, 338 (5th Cir. 2007) (noting that a four-

month gap has been sufficient for summary judgment purposes and finding that a two-and-a-half-month gap was temporally close enough to allow for an inference of causation). Though the record is not entirely clear on the exact date when the decision to hire Monica McKnight over Finch was made, it was sometime during the summer of 2014. This timing is sufficiently close to Finch's March 2014 allegations, her April 2014 meeting with human resources, and her July 2014 EEOC complaint to satisfy the causal element of Finch's prima facie case for retaliation.

Even though Finch makes out the prima facie case for retaliation, summary judgment is granted against her claim because she presents no evidence of pretext under the *McDonnell-Douglas* burden-shifting framework; in other words, there is no "evidence from which the jury may infer that retaliation was the real motive." *Swanson*, 110 F.3d at 1188–89. Since Finch satisfies the elements of her prima facie case, the burden shifts to Defendant to show a legitimate, nondiscriminatory reason for the employment decision. The summary judgment record reveals numerous, uncontested reasons—notably, Finch was not the best candidate for the job. Members of the interview panel who were unaware of her allegations against Uribe stated that Finch "did not present herself as someone who had the needed skills of being a leader," Docket no. 39-7 at 2, that she gave unresponsive and confusing answers to interview questions, Docket no. 39-8 at 2–3, that she lacked technical knowledge, *id.*, and that she was not the best candidate for the position. Docket no. 39-9 at 2.

Being supported by sufficient evidence of a legitimate, nondiscriminatory motive to hire the best candidate, the burden shifts back to Finch to show that the proffered reason is pretextual, and that the real reason was retaliatory. Because Finch has no evidence of pretext, summary judgment is appropriate against her retaliation claim for failure to hire. Finch points to "the evidence of pretext and lies told by Robert Uribe" to "call into question any assertion [of a

legitimate, nondiscriminatory motive] made by Defendant," without any citations to the record or explanations of Uribe's alleged lies and how they show a retaliatory motive. These conclusory and unsubstantiated assertions, unsupported by the evidentiary record, are not the type of evidence that can stave off summary judgment. *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004). Moreover, even if there were evidence in the record relating to Uribe's "pretext and lies," there is no evidence of the same from others involved in the hiring and interview process. It is undisputed that other members of the interview committee were unfamiliar with Finch and her allegations of harassment and discrimination. Docket no. 39-7 at 3; Docket no. 39-8 at 2. Because Finch has presented no evidence that the hiring and interview process's hiring the best candidate for the position was pretextual or retaliatory, summary judgment is appropriate.

### 3.  Performance Improvement Plan

The last allegedly adverse employment action that Finch suffered is her placement on a performance improvement plan ("PIP"). Finch argues that she was placed on the PIP on March 27, 2014, within two days of bringing her complaints to Scepanski, and that she was never the subject of disciplinary or performance-related action prior to the PIP. These allegations do not make the PIP a materially adverse action. "[W]ritten warnings and unfavorable performance reviews [such as PIPs] are not adverse employment actions where colorable grounds exist for disciplinary action or where the employee continues to engage in protected activity." *Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 286 (5th Cir. 2015) (citing *Burlington Northern*, 548 U.S. at 68). For both reasons, Finch's placement on the PIP is not an adverse employment action. Colorable grounds existed for the PIP, as Uribe noticed and documented performance issues during the Communications Unit's restructuring period from October 2013 through the early part

of 2014, and began formulating the PIP at that time. Docket no. 39-2 at 3. Additionally, Finch continued to engage in protected activity after being placed on the PIP by pursuing her allegations of sexual harassment with human resources in April 2014, Docket no. 39-5 at 2–4, and by filing her EEOC complaint in July 2014, Docket no. 39-1 (Ex. A-8) at 43–44. As such, her placement on the PIP is not a materially adverse employment action.

Even if placement on a PIP did constitute an adverse action, there is no genuine issue of fact as to whether Finch's allegations to Scepanski are causally linked to her placement on the PIP. Uribe testified that he began developing the PIP in early 2014, before Finch made any allegations or engaged in any protected conduct. Finch has not raised any evidence to the contrary. Despite the temporal proximity, it seems inevitable that Finch would have been placed on the PIP. For these reasons, summary judgment is appropriate here as well, and Finch's Title VII retaliation claims are dismissed.

### iii.  Sex Discrimination Claims

To establish the prima facie case for sex discrimination under Title VII, a plaintiff must show that (1) she belongs to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by someone outside her protected class, or similarly situated employees outside the protected class were treated more favorably under nearly identical circumstances. *Earle v. Aramark Corp.*, 247 F. App'x 519, 523 (5th Cir. 2007) (citations omitted). For an action to be adverse in a discrimination claim, it must relate to "ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *McCoy v. City of Shreveport*, 492 F.3d 551, 559–60 (5th Cir. 2007).[3]

---

[3] The legal standard for what constitutes an adverse employment action in the discrimination context is to be distinguished from the standard applicable to retaliation claims. As previously noted with respect to Finch's retaliation claims, the Supreme Court in *Burlington Northern* held that "a plaintiff [in a retaliation case] must show that a reasonable employee would have found the challenged action materially adverse, which in this context means

As she argued in her retaliation claims, Finch points to the same three actions for her discrimination claim—(1) removal of her job duties; (2) failure to hire her for the Assistant Communications Manager position; and (3) her placement on the PIP. Again, the Court will assess each of these actions in turn.

### 1. Removal of Job Duties

For reasons similar to those justifying summary judgment against Finch's retaliation claim, summary judgment is appropriate here—any restructuring of Finch's job duties does not rise to the level of an adverse employment action. "The mere loss of some job responsibilities does not constitute an adverse employment action." *Thompson v. City of Waco, Texas*, 764 F.3d 500, 504 (5th Cir. 2014). Where, however, a change in or loss of job responsibilities is significant and material enough, it may rise to the level of an adverse employment action. *Id*. In *Thompson*, for example, the Fifth Circuit held that a city detective had adequately pled that he suffered an adverse employment action when his employer "rewrote and restricted his job description to such an extent that he no longer occupie[d] the position of detective" by taking away numerous responsibilities that were "integral and material responsibilities of a detective." *Id*.[4]

The evidence in the summary judgment record distinguishes this case from *Thompson*, leaving no genuine issue of material fact as to whether Finch's job duties were reduced to that severe a degree. As previously discussed, Finch's own account of her job duties in 2008, when

---

it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68. The Fifth Circuit has recognized, however, that this standard for "adverse action" applies only to *retaliation* claims, and that the standard in *discrimination* claims for determining whether employment actions are "adverse" remains unchanged. *See McCoy*, 492 F.3d 551, 560 (5th Cir. 2007) ("[O]ur precedent recognizing only 'ultimate employment decisions' as actionable adverse employment actions remains controlling [in spite of *Burlington Northern*] for Title VII *discrimination* claims and therefore continues to justify summary judgment dismissal." (emphasis original)).

[4] For example, he could no longer search for evidence, log evidence, be the affiant in a criminal case, work undercover, be the evidence officer at a crime scene, or be the lead investigator on an investigation. *Id*. at 505.

she had just started as the TAC, varies little from her own account of her job duties in 2014, after the alleged removal of her duties. Moreover, the reduction in these duties as it relates to her teaching of training sessions was due to her own scheduling and delegation of responsibilities. As such, there is no issue of material fact on whether restructuring Finch's job duties constitutes an adverse action, and summary judgment is granted here as well.

### 2. Failure to Hire

Finch's claim of sex discrimination arising from Defendant's refusal to hire her for the Assistant Communications Manager position is without merit. Though Defendant admits that this could be an adverse employment action, it is undisputed that Monica McKnight, a female, was eventually hired for the position. Accordingly, there is no genuine issue of material fact as to the fourth element of Finch's prima facie case—whether she was replaced by someone outside her protected class, or similarly situated employees outside the protected class were treated more favorably under nearly identical circumstances.

### 3. Performance Improvement Plan

For reasons similar to those relating to the PIP in the retaliation context, the PIP also fails to support Finch's discrimination claim. Placement on a PIP, without an accompanying demotion or reduction in pay, is not an "ultimate employment decision," and does not constitute an adverse action capable of supporting a Title VII discrimination claim. *Turner v. Novartis Pharm. Corp.*, 442 F. App'x 139, 141 (5th Cir. 2011). Here, Finch makes no claim that her PIP came with a lower job title or worse compensation or benefits. For this reason, the PIP is not an adverse employment action, and summary judgment is appropriate here as well.

### iv. Pregnancy Discrimination Claims

Summary judgment is granted against Finch's pregnancy discrimination claim because

she failed to exhaust her administrative remedies. Finch made no allegations of pregnancy discrimination in her first EEOC complaint, and indeed, did not become pregnant until four months after filing that complaint. Though she makes allegations of pregnancy discrimination in her second complaint, Finch admits that she does not have a right to sue letter from this complaint. Thus, Finch did not properly exhaust her administrative remedies with respect to this complaint or its allegations, as previously discussed, leaving no genuine issue of material fact to be decided on the exhaustion issue.

### v.  Hostile Work Environment Claims

Finch's last Title VII claim alleges that she was subjected to a hostile work environment on the basis of her sex by her supervisor, Uribe. To establish the prima facie case in these claims, a plaintiff must show "(1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a term, condition, or privilege of employment." *Donaldson v. CDB Inc.*, 335 F. App'x. 494, 501 (5th Cir. 2009). To affect a term, condition, or privilege of employment, harassing conduct "must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Id.* Whether conduct meets this standard depends on a number of factors—"frequency of the conduct, its severity, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance." *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005). This conduct must be objectively offensive to the reasonable person, and must have been subjectively offensive to the individual employee. *Donaldson*, 335 F. App'x. at 501. In hostile work environment cases involving supervisors, employers may avoid vicarious liability via the *Ellerth/Faragher* affirmative defense, based

broadly on their response to the harassment. *Id.* at 502; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

Defendant asserts the *Ellerth/Faragher* defense, but the Court need not reach it in granting summary judgment against Finch's claim because there is no genuine issue of material fact on whether Uribe's harassment affected a term, condition, or privilege of employment. Finch's allegations of a hostile environment are that Uribe stared at her breasts during a meeting in December 2013 while asking "is it hot in here?" and that he stared at her breasts on some other occasions over a period of months. None of the factors involved in this analysis point towards Uribe's harassing conduct being sufficiently severe. The conduct does not appear frequent, as Finch points to one specific instance and an unspecified number of unspecified instances over the months-long period that Uribe was her supervisor. The conduct is not particularly severe, was never physical, and was only once accompanied by any verbal statements. The conduct was not at all threatening. Finally, there is no indication that Uribe's staring or single comment interfered with Finch's performance of her job duties at all, let alone in an unreasonable way.

In addition, Uribe's conduct is milder and less offensive than that of employers and supervisors in cases where the Fifth Circuit has found that harassing conduct does not affect the terms, conditions, or privileges of employment. *E.g.*, *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328 (5th Cir. 2004). In *Hockman*, the Fifth Circuit affirmed a grant of summary judgment against an employee's hostile work environment claims because the supervisor's conduct was not sufficiently severe or pervasive. *Id.* The supervisor there

> (1) . . . once made a remark to [the employee] about another employee's body, (2) he once slapped her on the behind with a newspaper, (3) he "grabbed or brushed" against [the employee's] breasts and behind, (4) he once held her cheeks and tried to kiss her, (5) he asked [the employee] to come to the office early so that they

could be alone, and (6) he once stood in the door of the bathroom while she was washing her hands.

*Id*. On the opposite end of the spectrum, Finch's allegations are a far cry from cases where the Fifth Circuit has found that conduct was sufficiently severe to create an issue of fact and overturn a grant of summary judgment. *E.g.*, *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 478 (5th Cir. 1989). In *Waltman*, the plaintiff was touched in a sexual manner by numerous coworkers and was the target of sexual comments on a weekly basis. *Id*. at 471. Sexual graffiti, some of which was directed at the plaintiff, covered the walls of the elevators and bathrooms in the workplace. *Id*. One of the plaintiff's coworkers told another coworker that the plaintiff "was a whore and that she would get hurt if she did not keep her mouth shut." Another coworker threatened to "cut off [the plaintiff's] breast and shove it down her throat," and later dangled the plaintiff from a stairwell 30 feet above the ground below. *Id*. The Fifth Circuit reversed a grant of summary judgment in favor of the defendant on whether the plaintiff produced sufficient evidence to raise an issue regarding the existence of a hostile work environment. *Id*. at 478.

Summary judgment is thus granted against Finch's hostile work environment claims, as there is no genuine issue of material fact on whether the harassment Finch suffered at the hands of Uribe was severe and pervasive enough to affect a term, condition, or privilege of employment.

### c. FMLA Claims

Defendant's motion for summary judgment with respect to Finch's FMLA claims is likewise granted. Finch's complaint alleges claims of denial of FMLA leave and retaliation for taking FMLA pregnancy leave upon her return from leave in December 2014.

Finch's denial of leave claim is meritless. The record is clear and there is no dispute that Finch was granted leave, which destroys any cause of action for denial of leave. Docket no. 39-1

at 120–121. Summary judgment is granted against Finch's denial of FMLA leave claim.

Last, no genuine issue of material fact remains on whether Finch was retaliated against for taking FMLA pregnancy leave. Finch took leave from mid-November to mid-December. Upon her return, she accepted a voluntary transfer to the Fusion Unit, where she is employed with no complaints being made by her and with the same pay and benefits as before the transfer. She admits that her transfer was not retaliatory, and points to no instances of retaliation for taking FMLA leave. Because there is no evidence of retaliation for taking FMLA, summary judgment is granted against Finch's FMLA retaliation claim.

## CONCLUSION

Plaintiff Melissa Finch's Motion to Strike (Docket no. 54) is DENIED. Defendant City of San Antonio's Motion for Summary Judgment (Docket no. 39) is GRANTED. Without deciding the merits of Defendant's Motion to Strike (Docket no. 49), the Court considered all evidence submitted by Plaintiff, including evidence objected to by Defendant, before reaching its decision on the Motion for Summary Judgment. Defendant's Motion to Strike (Docket no. 49) is thus DISMISSED as moot. Plaintiff's claims are hereby DISMISSED WITH PREJUDICE. The Clerk is directed to issue a Judgment in favor of the Defendant, and that Plaintiff take nothing on her claims. Defendant shall submit its Bill of Costs within 14 days in the form directed by the Clerk should it desire to pursue these costs.

It is so ORDERED.

SIGNED this 13th day of September, 2016.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE